CHARLES R. MILLIKEN *vs.* CULLEN C. CHAPMAN.

Cumberland.    Opinion June 26, 1883.

*Promissory notes.    Sales.    Caveat emptor.*

Where one sells negotiable business paper in good faith without endorsing it, making no misrepresentations respecting it, and at a rate of discount indicating that the purchaser has a compensation for his risk, there is no implied warranty on the part of the seller as to' the past, present or future solvency of the makers or indorsers.

In cases of sale or barter of commercial paper as of other personal property the rule of *caveat emptor* applies.

In an action to recover the purchase money for which a negotiable promissory note of the Dennison Paper Manufacturing Company was sold, the defendant requested the following instructions : " that if at the time of the sale plaintiff had knowledge of a fact obtained in conversation with A. C. Dennison materially impairing the financial credit of the Dennison Paper Manufacturing Company and which he knew or had reason to know was unknown to defendant, it was his duty to communicate such knowledge to defendant when he sold said notes to him, and if he did not do so, such concealment would be a fraud upon defendant and authorize him to rescind the trade." *Held*, that the instruction was properly refused.

*Baxter* v. *Duren*, 29 Maine, 434, partially affirmed, and *Hussey* v. *Sibley*, 66 Maine, 192, considered.

ON EXCEPTIONS, and report on motion to set aside the verdict.

Assumpsit to recover the amount of the following due bill :

" June 27, 1879.   Due C. R. Milliken, $3,625, Thirty-six hundred and twenty-five dollars.   C. C. Chapman."

Writ was dated August 7, 1880.

(Declaration.)

" In a plea of the case for that whereas at said Portland, said Milliken on the twenty-seventh day of June in the year of our Lord eighteen hundred and seventy-nine sold and delivered defendant sundry notes of the Dennison Paper Manufacturing Company, said Chapman in consideration thereof then and there promised plaintiff to pay him thirty-six hundred and twenty-five dollars on demand, payment of which was then and there demanded.   Yet the said defendant, though requested, has not paid the same, but neglects so to do."

At the trial the presiding justice instructed the jury upon one branch of the case as follows :

" Then I think it is claimed here in this case that there were some concealments, some keeping back of something that should have been known ; that there was information obtained but a short time before this, perhaps on the very day, by conversation with Mr. Dennison, which should have been revealed to the defendant.

" Now a mere concealment in a case like that, keeping back, where there is no fiduciary relation existing between the parties, is not a matter of fraud ; that is, where each party stands upon the same plane, each party acting for himself, and each party relying upon his own judgment with regard to the matter, although there may be some facts known to one party that are not known to the other, he is under no obligation to reveal them. But when information is asked and some part of the truth may be told then he is bound to tell the whole truth ; for the concealment of a part truth when a part is told would in fact be a misrepresentation ; so if there is any such fact in existence which was kept back, material for the other party to know, then any statements or conduct on his part tending to deceive the other party or to keep that fact or information away from him, would in fact be fraudulent ; he has no right to do anything to throw the other party off the track, so to speak, to draw his attention away from this important fact or to prevent him from making further inquiry or such inquiry as he might otherwise have made.

" Therefore if there is any concealment of a material fact and here is a question raised between counsel as to whether that is a material fact or not and it is for you to decide ; I say if there was a material fact there, which he kept back under the circumstances which I have stated to you, that he was telling a part of the truth in answer to a request for information, or if he was guilty of any acts or words which tended to keep the other party from making proper investigation, to prevent him from ascertaining that fact, to lead him away from it and he succeded in that matter, why so far it would be a fraud."

Other material facts are fully stated in the opinion.

*William L. Putnam,* for the plaintiff, °cited: *Hanson* v. *Edgerly,* 29 N. H. 343; *Hammatt* v. *Emerson,* 27 Maine, 308; *Atwood* v. *Chapman,* 68 Maine, 38; *Prentiss* v. *Russ,* 16 Maine, 30; *Bank* v. *Cooper,* 36 Maine, 197; 2 Kent's Com. 490, 482*; Story's Eq. Jur. §§ 207 *et seq,* 146, 149; *Cross* v. *Peters,* 1 Maine, 393; *Davies* v. *London & P. M. Ins. Co.* 8 L. R. ch. Div. 469; *Ward* v. *Hobbs,* 4 App. Cas. 26; *Mc-Cobb* v. *Richardson,* 24 Maine, 82; Story's Eq. § 150; *Biggs* v. *Barry,* 2 Curtis, 259; *Lupin* v. *Marie,* 2 Paige, 169; *Smith* v. *Hughes,* 6 (L. R.) Q. B. 597; *Kennedy* v. *Panama Mail Co.* 5 (L. R.) Q. B. 587; *Littauer* v. *Goldman,* 72 N. Y. 506; *Camidge* v. *Allenby,* 6 B. & C. 373; *Bicknall* v. *Waterman,* 5 R. I. 43; *Beckwith* v. *Farnum,* 5 R. I. 231; *Frontier Bank* v. *Morse,* 22 Maine, 97; *Whitbeck* v. *Van Ness,* 11 Johns. 409; *Day* v. *Kinney,* 131 Mass. 37; Byles on Bills, *154; *Evans* v. *Whyle,* 5 Bing. 485; Daniel's Neg. Inst. (2 ed.) §§ 737, 739.

*S. C. Strout and C. F. Libby,* for the defendant.

This case was submitted to the jury upon the question of fraud in the sale of the notes *only,* and the matters embraced in the first three requests for instruction were not submitted to the jury, and have not been passed upon by them. These requests were pertinent to the issue, and should have been granted. The first request is based upon a *mutual mistake,* without any bad faith. The Dennison notes were sold defendant, as current paper of a running concern, reputed solvent. This is implied from the transaction as narrated by both sides, and follows from the price. In such cases, there is no contract binding upon the parties, but it is voidable, and defendant, it is admitted, did all that was necessary to rescind. *Norton* v. *Marden,* 15 Maine, 45; *McCobb* v. *Richardson,* 24 Maine, 85; *Warner* v. *Daniels,* 1 Wood. & M. 90, 107, 110; *Smith* v. *Babcock,* 2 Wood. & M. 246, 260; *Mason* v. *Crosby,* 1 Wood. & M. 342; *Doggett* v. *Emerson,* 3 Story, 700; *Daniel* v. *Mitchell,* 1 Story, 172; *Wheelden* v. *Lowell,* 50 Maine, 505; *Hammatt* v. *Emerson,* 27 Maine, 308.

The doctrine of *caveat emptor*, as applied to sales of notes, must be construed somewhat differently from its application to sales of chattels. In the sale of chattels, the purchaser can see, by inspection, the quality of the article, and so can intelligently buy on his own judgment. But in the sale of a note, inspection will only show the form of the paper. The essential thing, the ability of the maker to pay the paper, is to be learned elsewhere.

In *Baxter* v. *Duren*, 29 Maine, 434, it was held that the seller did not even warrant the genuineness of the signature, but this case has been substantially overruled in *Hussey* v. *Sibley*, 66 Maine, 196; and absolutely overruled in *Merriam* v. *Walcott*, 3 Allen, 258; *Bank* v. *Morton*, 4 Gray, 156.

Now, we may say, the seller represents the paper as genuine, and, unless sold as failed paper, he also represents it, as at the time, current paper, with mercantile credit and reputed solvency. Suppose the sale was of a horse in a pasture, at a distance, and both seller and buyer had seen the horse, well and right within a few days, and the trade was made upon the knowledge of each, without representation, when in fact, the horse died the day before, both parties ignorant of the fact — would the buyer be bound? Or if the horse had under these circumstances broken a leg, rendering him valueless, would the contract be enforceable? See *Benedict* v. *Field*, 16 N. Y. 595. *Harris* v. *Hanover National Bank*, U. S. circuit court, southern district of New York, not yet reported.

The second and third requests are based upon the failure of the Dennison Company, antecedent to the sale of the notes. Was the company a failed corporation at the time of the sale? We say, upon the evidence, that it was. A check of the company, drawn upon the Casco Bank, where it kept its deposits and had done its business for many years, was protested for non-payment at that bank on June 25, two days before the transaction between plaintiff and defendant, and was never paid, except by compro-- mise at 25 per cent in the final settlement of the corporation.

We submit that a failure, in the legal and commercial sense, takes place when a debtor, being insolvent, recognizes that fact, and ceases to make any effort to meet maturing obligations; and

whenever this state of facts can be proved, as it is in this case, a failure is established. If it was failed paper, as we say it was, when sold defendant, then the consideration for defendant's memorandum failed, and he might rescind. He purchased living, current, unfailed paper, and received dead and failed paper. He paid, or agreed to pay, for what was never delivered to him, and both good morals and law declare him not bound to perform a promise, the consideration for which has thus failed. It is well settled law, that payment of a debt in bills, which are nothing but notes of a failed bank, both parties being ignorant of the fact, does not operate as payment. 2 Greenl. Ev. § 522; *Frontier Bank* v. *Morse*, 22 Maine, 88; *Owenson* v. *Morse*, 7 Term, 64; *Young* v. *Adams*, 6 Mass. 182; *Merriam* v. *Walcott*, 3 Allen, 258; *Hazard* v. *Irwin*, 18 Pick, 105.

The fourth request we regard as clearly good law, and should have been given, while the instruction actually given, we submit, does not accurately present the law upon this point. The instructions given are based on the doctrine of *caveat emptor*, as applied to sale of chattels, where inspection affords the means of judgment as to quality and value. *Biags* v. *Ins. Co.* 1 Wash. C. C. 506; *Elton* v. *Larkins*, 5 C. and P. 385; *Murgatroyd* v. *Crawford*, 3 Dallas, 491; *Stetson* v. *Ins. Co.* 4 Mass. 330; *Curry* v. *Ins. Co.* 10 Pick. 535; *Bridges* v. *Hunter*, 1 M. and S. 15; *Hoyt* v. *Gilman*, 8 Mass. 336; *McLanahan* v. *Ins. Co.* 1 Pet. 170; 1 Parson's Mar. Ins. 467; Kerr on Fraud ·and Mistake, 100, 109, 98; *Prentiss* v. *Russ*, 16 Maine, 30; *Brown* v. *Montgomery*, 20 N. Y. 287; *Mitchell* v. *Worden*, 20 253; *Pequeno* v. *Taylor*, 38 Barb. 375; 2 Parsons on Bills, 207; Barb. Story, Promissory Notes, § 389, n. 2; *Weddigen* v. *Boston Glass Co.* 100 Mass. 422; *Kidney* v. *Stoddard*, 7 Met. 252; *Hill* v. *Gray*, 1 Stark. 434; *Brown* v. *Montgomery*, 20 N. Y. 287; 2 Kent's Com. 482, 645; *Laidlow* v. *Organ*, 2 Wheat. 178; 1 Parsons on Contracts, 583, 578; *Gardiner* v. *Gray*, 4 Camp. 143, a leading case.

The principle contained in the fourth request is entirely within the reason and principle in the foregoing authorities, and should .have been given to the jury, instead of the opposite instruction .in fact given. *Merriam* v. *Lapsler*, 12 Fed. Rep. 458.

BARROWS, J.   Assumpsit to recover the amount of a due bill, given by the defendant to the plaintiff, June 27, 1879, for $3625. The consideration of the due bill was the sale by plaintiff to defendant, who was a broker, dealing in commercial paper, of three promissory notes amounting to $3700, made on that day by the Dennison Paper Manufacturing Company, payable in one, two and three months to their own order, and by them endorsed to plaintiff in payment for pulp sold and delivered to them by a pulp manufacturing company, of which plaintiff had charge.

Defendant pleaded the general issue, with a brief statement that the sale of the notes referred to in the plaintiff's declaration as the consideration of defendant's promise, was effected by the fraudulent misrepresentations of the plaintiff, and has been rescinded by defendant.   The cause having been tried upon this issue, and the verdict being against him, the defendant brings the case here upon a motion to set aside the verdict, and upon exceptions to the presiding judge's refusal to give certain requested instructions, and to adverse instructions given, touching the matters to which the requests relate.

The requests relate with a single exception to matters not put in issue by the pleadings.   Apparently, the defendant being doubtful whether he had made out a defense on the ground of fraudulent misrepresentation by the plaintiff, desired to place his claim to rescind on the ground of mutual mistake, and the first three requests are based upon the hypothesis (inconsistent with the fraud alleged) that the jury would find that the plaintiff, as well as the defendant was ignorant of certain existing facts which the defendant claimed, gave him the right to rescind when they came to his knowledge.   The plaintiff's right to recover, had the general issue alone been pleaded, was, upon the evidence adduced, unquestionable.   The defendant's due bill was given for a valid, and to some extent, valuable consideration, there being, at the worst, *not a want*, but a *partial failure* of consideration.   Strictly speaking, in order to enable the defendant to prevail upon the ground that he had a right to rescind because of the existence of material facts, of which both parties to the contract were ignorant, that matter should have been pleaded by an additional brief

statement, and the judge's refusal of the requested instructions might be justified for want of it.

But as counsel have, without objection on either side, fully argued the case on the question of the correctness of the requests and instructions, we think it best to regard the case as rightly before us, on these points.

What are the essential facts in proof here, to which the first three requested instructions were to be applied? in addition to those already adverted to — substantially, these: The plaintiff was selling the product of the pulp mill, freely to the makers of the notes up to the very day of this transaction — two car loads being then on the way to them, the price of which, however, did not enter into the notes sold to defendant. They had been large customers of the plaintiff from the time he took charge of the pulp mill, as they had been of its previous managers. They had carried on the paper manufacturing business for more than thirty years under the same management, and there was a large amount of real and personal estate, estimated by their treasurer at $500,000, apparently unincumbered standing in their names. The course of business between them and the plaintiff, was partial payment in cash, as the pulp was received, and from time to time batches of notes on different times designed to cover the balance of the account. Some of these notes had been sold by plaintiff to defendant six or eight months previous to this sale, at a considerable discount and conversation had passed between them, indicating clearly that defendant knew that plaintiff was disposed to sacrifice a portion of his profits in the pulp making business, in order to be free from risk.

At a later date, failing to agree with defendant about the discount to be made upon the sale, the plaintiff had had the notes which he took, discounted at the banks with his own endorsement. But shortly before the sale of these notes, the defendant's clerk had suggested to the plaintiff that his employer was ready again to trade for the paper. Both plaintiff and defendant were subscribers to Russell's commercial agency, upon the books of which it had appeared for months, that the Dennison Paper Manufacturing Company, was more or less pressed for money, and

slack in its payments; but in connection with this, there were details and information upon the whole favorable to their credit and probable solvency. Under these circumstances the plaintiff, who had been engaged for some days in making preparations for the opening of a mountain house, largely resorted to by pleasure travel, which he was carrying on, fell in with the treasurer of the Paper Manufacturing Company, on board the cars on his way to Portland, called on him to step into his office on his way up town, and give him notes as before for about the balance of his account, asked him how they were getting along, and was informed that they were doing as well as usual, except that their selling agent in New York who had just been at the mill, had demurred about accepting for $5000, which they had asked him to accept to carry them through the month, but had finally consented on receiving the assurance of the superintendent at the mill, that they could make it good the next month. The company had frequently before had similar accommodation from their selling agent. On their arrival in Portland the treasurer gave the plaintiff a batch of notes, and the plaintiff took them to the defendant's office, and after a brief negotiation, sold three of them to the defendant, without mentioning the fact that had been communicated to him that the makers' selling agent had hesitated about accepting for them as above mentioned, and only consented to do so on the assurance of the superintendent that it would be made good the following month. The sale of the notes to the defendant was made at a discount of twelve per cent, while the going rates for prime commercial paper was from three and one-half to four and one-half per cent.

In point of fact the selling agent determined, on that very day, not to give the accommodation acceptance he had previously promised, so notified the superintendent, sent a mortgage for $100,000, which he had had for a number of months on the mill property to be recorded, and, thereupon, the same afternoon, after the sale of the notes to the defendant, the treasurer gave up the attempt to meet their paper then maturing, and one of their notes for $1500 or more, went to protest, and ultimately they paid their creditors only twenty-five per cent. The defendant hearing

of the failure the next morning, refused to pay the due bill, offered to return the notes, and, it is admitted, did all that was necessary to rescind the bargain, if he had the right to rescind it. It further appeared that two days previous to this, a check upon a Portland bank, where the Dennison Paper Manufacturing Company had been in the habit of keeping a deposit, dated June 12, 1879, for less than a hundred dollars which had been sent to one of their distant creditors, and had been passing from hand to hand till June 25, was protested for non-payment, but it did not appear that any notice of the fact could have reached the makers of the check on the 27th.

Whether there was any actual misrepresentation on the part of the plaintiff, in order to procure the sale, was a question upon which the evidence was directly conflicting — the testimony coming from witnesses, so far as we can judge, of equal credit and good standing, and apparently supported on either side by corroborating circumstances of which we doubt not counsel made all practicable use in their arguments to the jury. The verdict must be regarded as settling this point against the defendant, on whom rested the burden of proof, provided the jury were rightly instructed. Upon the foregoing proof, the defendant requested certain instructions, the essential parts of which are as follows:

1. "That if in the sale of the notes both parties acted under a mutual mistake, as to one or more facts material to the transaction, and defendant was injured thereby, the contract was voidable and defendant might rescind it."

2. "That if at the time of the sale of said notes the makers were insolvent, and had, in fact, failed, and the paper was worth but a small per centage of its face, both plaintiff and defendant being ignorant of the fact, the contract of sale would be voidable and defendant might rescind it."

3. "That if the jury find that on June 25, two days prior to the sale of the notes, a check of the makers had gone to protest at the Canal bank, in this city, and still remained unpaid at the time of said sale, this is sufficient evidence of the failure of the makers at that time, to warrant the jury finding that the notes were the notes of a failed corporation at the time they were purchased."

These instructions were not given, but the case was put to the jury for determination upon the issue of fraud in the procurement of the sale by the plaintiff, which was the main ground of defence. Manifestly the instructions, if given, would have tended to weaken the defendant's position before the jury upon the question of fraud, for they are predicated upon the hypothesis that the jury would find that the plaintiff, as well as the defendant, was ignorant of the real fact, with regard to the solvency of the makers of the notes, which would be equivalent, under the circumstances, to absolving him from the charge of fraud, and would negative all motive on his part for its commission.

But what we have undertaken to determine is, whether upon the evidence here adduced they present the correct rule for the determination of the rights of the parties — in fine, whether mutual ignorance or mistake as to the actual solvency and pecuniary ability of the makers of notes so sold at the time of the sale, would give the purchaser the right to rescind, which is here claimed.

It is plain that if the doctrine contended for by the defendant, as to the effect of mutual ignorance of material facts of the parties to a sale of negotiable paper, be carried to its logical results, the actual pecuniary condition of the promisors at the time of the sale must be open to inquiry, for that is the one fact above all others "material to the transaction," in the sense in which defendant's counsel use the phrase. But unless the doctrine can be maintained even to this extent, the first requested instruction was rightly refused, for, without specification of the nature of the facts that might be regarded as giving the defendant the right to rescind, it would be liable to mislead the jury. Even conceding it to be a correct statement of an abstract principle, it would not be an appropriate instruction in such a case from the manifest tendency it would have to mislead the jury when they came to apply it in the consideration of the case. But nobody claims that the seller of negotiable paper, who does not endorse it, but without fraud sells it for what it will bring in the market, guaranties that the makers are actually solvent, though some cases go so far as to hold that he does guaranty that up to the

time of the sale, there shall have been on their part no open act of failure or bankruptcy, or other matter notoriously affecting their credit. It is well known that in the great majority of cases, especially in cases of the failure of those who have been long in business, the decay is gradual, the struggle against adverse fate and insolvency protracted, and that of all their commercial paper which is afloat when they finally break, hardly a piece can be found that was given when they were in fact solvent, but all, or nearly all, was issued in the prolonged effort to maintain their credit until some favorable turn should set them right.

It would seem to be an anomaly to hold that although he who procures a note to be discounted with his endorsement, is chargeable with the debt only upon due presentment, demand, and notice, still one who sells it outright in good faith, for what it will bring without his endorsement, can be held, practically almost as a guarantor without demand or notice, on the ground that he impliedly warrants that the makers are solvent at the time of the sale, when there is such a predominance of chances, that it will turn out they were not so, if the paper is not met at maturity, and that the adjustment of their affairs will develop the fact.

The cases which have a bearing, more or less direct upon the questions here raised, are so numerous that to attempt a review of them, individually, would protract this opinion to an unreasonable and unnecessary length.

The ultimate object of inquiry is, what does the seller of commercial paper, who disposes of it in good faith in the market, without becoming a party to it, and not in payment of a debt payable in money, then, or previously contracted, impliedly warrant — on the failure of which the purchaser is entitled to rescind the trade?

There is a class of cases like *Baxter* v. *Duren*, 29 Maine, 434, 441, and authorities there cited, which hold that the only implied warranty is, that the seller owns or is lawfully entitled to dispose of the paper — that "the law, respecting the sale of goods, is applicable," and *caveat emptor* the rule. Whether this statement of the principle would now be held to exclude a warranty of the genuineness of the signatures is not a question arising in this case.

It may be that we should now say that the promise of the apparent parties, was the essence of the thing sold, and that a mutual mistake as to its existence would be a mistake as to the identity of the subject of the sale, and good ground of rescission. We have no occasion to consider that question here; but the defendant's counsel are in error in supposing that *Baxter* v. *Duren,* was overruled in *Hussey* v. *Sibley,* 66 Maine, 192 - 196. That was a case of attempted payment upon an existing debt by a town order, which was void for want of authority in the makers, and though in adverting to *Baxter* v. *Duren,* some authorities holding doctrines adverse to the extension of the principle to cases involving the genuineness of the signatures are cited, and some remarks made which may be construed as approving them, still the decision in *Hussey* v. *Sibley,* is carefully placed, (see p. 196) " upon the ground that the order *having been delivered in payment af an existing debt,* and proving invalid, fails to operate as a payment." Thus the court still maintains the distinction asserted in *Baxter* v. *Duren,* between negotiable paper transferred without endorsement in payment of a debt due or then contracted, and transactions where the paper is sold or bartered as other goods and effects are.

We have no occasion then to give further attention in this connection to the numerous class of cases in which the note was simply transferred in payment of a debt. They afford no rule for cases of sale. The creditor, who is entitled to cash payment, gets no consideration and very properly therefore, is not required on the reception of what is rather a means of payment than actual satisfaction, to assume any risk. If the means fail the end is not reached, and the courts rightly hold that there is no payment. Not so with a sale, in which the price is affected by the risk, 'and the purchaser gets perhaps, as in the present instance, three times the market rate for prime commercial paper, by way of discount in consideration of the hazard greater or less which he assumes. The condition of the promisor as to solvency and pecuniary ability affects, not the essence, but the quality of his promise which is the subject of the sale; and to all such cases we are content to apply the rule thus enunciated

by the Rhode Island court in *Bicknall* v. *Waterman*, 5 R. I. 43 : "The well known common law principle applicable alike to sales and exchanges of personal things, is that fraud or warranty is necessary to render the vendor or exchanger liable in any form for a defect in the quality of the thing sold or exchanged. Applying this principle to the sale or exchange of the note of a third person transferred by endorsement without recourse or by delivery merely, the vendee or person taking it in exchange, takes the risk. " And in *Beckwith* v. *Farnum*, *Id.* 230, the same court say : " The barter or exchange of a promissory note endorsed without recourse for cotton or any other species of merchandise, carries with it no implied warranty of the past or future solvency of the maker of the note. The rule *caveat emptor* applies in the absence of fraudulent representation or concealment. "

For obvious reasons these doctrines have no application to cases of the transfer of bank notes or bankers' demand notes used as currency from one party to another, whether in payment or exchange. It is of the essence of such paper that the makers should be in good credit. It is no longer currency when they fail, and the case is analogous to the sale of an animal which, unknown to the contracting parties is dead, or destroyed to all intents and purposes by the breaking of a leg, before the contract is complete. But there is an essential difference between paper designed to pass as money, and ordinary commercial paper which is the subject of trade and speculation between brokers and their customers.

The case of *Frontier Bank* v. *Morse*, 22 Maine; 88, was a case of simple exchange of currency supposd to be equally valuable for the convenience of the parties. No element of risk or compensation for risk assumed, entered into the transaction. It affords no rule for the regulation of brokers' purchases of business paper. There the risk of insolvency is an important element in fixing the price, as we see in the transaction under consideration. It is precisely because the broker knows that he assumes this risk, that he demands it may be three times the going rate of discount and compensation for the use of money, and the seller accedes to the demand because he is

willing to sacrifice a portion of his profits in order to realize at once and with certainty, the remainder. That these parties so understood it, appears from the account given by themselves and the defendant's clerk, of the significant conversation which occurred at the time of the first dealings between them in this paper. The defendant's version of it is that plaintiff told him "that he came in to see if he could sell some paper that he might take in the course of his business — that he had a good commission and he thought he should like to sell the paper and make, I think the expression he used was, "a sure thing of it. " It is idle to argue in the face of such a communication between the parties, that the seller who submitted to an exaction of thrice the going rate upon prime paper in order " to make a sure thing of it, " impliedly warranted anything about the solvency of the makers of the paper he was selling. He warranted nothing but good faith and the right to sell; and the requests asserting a right to rescind on the ground of mutual mistake, were rightly refused. Not even equity would interpose in such a case. *McCobb* v. *Richardson*, 24 Maine, 82. What we mean to hold is that he who in good faith sells negotiable paper for what he can get without endorsing it, or making any false representations respecting the solvency of the makers, warrants nothing as to their condition in that respect, past, present or to come. The court that ignores as too shadowy, the distinction between paying a debt in failed paper and selling the same in good faith for what the buyer is willing to give, will inevitably find itself involved in ascertaining the still more shadowy difference it makes to the purchaser of paper that has a month to run, whether the maker fails on the day of the purchase, or the day before, or the day after — or as in *Harris* v. *Hanover Nat. Bank*, U. S. Circuit Court, Southern District of New York, (not yet published) which we have seen but cannot concur in, will find itself perplexed to determine whether there is a material mistake of fact in a sale of paper in New York at eleven o'clock because it turns out that (unknown to the parties) an attachment was put on the property of the maker in New Orleans at half past ten New York time. We think it might promote litigation,

but would seriously embarrass other business transactions, if the validity and certainty of the latter were made to depend on distinctions so subtle.

We prefer to rely upon the earlier wisdom of the cases we have cited, and *Whitbeck* v. *Van Ness*, 11 Johns, 409; *Evans* v. *Whyle*, 5 Bing. 485; Byles on Bills, * 154; Daniells on Negotiable Instruments, 2d Ed. § § 737 *and seq.*

It remains only to determine whether the fourth requested instruction was properly refused and whether the instructions given upon the point therein referred to were correct. The request was that the jury should be instructed " that if at the time of the sale, plaintiff had knowledge of a fact obtained in conversation with A. C. Dennison, materially impairing the financial credit of the Dennison Paper Manufacturing Company, and which he knew or had reason to know was unknown to defendant, it was his duty to communicate such knowledge to defendant when he sold said notes to him, and if he did not do so, such concealment would be a fraud upon defendant and authorize him to rescind the trade." This relates to the fact before mentioned that the selling agent of the company had hesitated about giving them the $5000 accommodation acceptance and had only agreed to do it upon the assurance of the superintendent that it would be made good from the product of the mill the following month. It might be questionable whether this information was not better adapted to lull, than arouse the suspicions which one who was cognizant of the matters long before spread upon the records of the Commercial Agency might entertain. The ultimate consent of the selling agent might well be supposed to indicate continued confidence on the part of those best acquainted with the actual standing of the company. But if it be conceded that this was a fact "materially impairing the financial credit " of the company, still the request was fatally defective, and if given it would have furnished the plaintiff good ground of exception. It is not predicated upon the idea that the fact was designedly withheld by the plaintiff, and it deals with an omission which might be merely accidental, occasioned by the haste of the transaction, or the want of perception on the

part of the plaintiff of the importance of the information in the same manner as if it were designed and fraudulent, and declares that the simple failure to mention every fact within the plaintiff's knowledge which he knew or ought to have known, would be regarded as materially impairing the credit of the company, would be a fraud authorizing a rescission if the plaintiff *had reason to know* that it was unknown to the defendant — thus making the jury, acting in the light of subsequent events, the judges of what the plaintiff ought to have regarded as facts detrimental to credit and probably unknown to defendant, and not requiring them to find that he purposely withheld the information in order that defendant might be deceived. Under such a rule it would be impossible for a dealer to know whether he had sold an article or only made a contract voidable at the option of the other party, if he became dissatisfied with his bargain. The seller's good faith and honest intention count for nothing if he carelessly omits to tell everything he knows that might be said in disparagement of the article he has to dispose of, whether it occurs to him at the time or not, in case there is reason to suppose the purchaser does not know it. There is no such impracticable rule of law. On the other hand, it is *caveat emptor* where there is neither fraud nor warranty; and the intention to conceal — the fraudulent purpose, — the idea present in the mind of the seller that the purchaser has not equal means of information in respect to the fact — must be found in order to give the vendee a right to rescind on such a score.

This is the doctrine approved in *Prentiss* v. *Russ*, 16 Maine, 30, cited for defendant. In *Baglehole* v. *Walters*, 3 Camp. 154, all the elements which are called for in *Prentiss* v. *Russ*, to make a case of fraudulent concealment, were present. The owner of the vessel had had her on the ways and discovered that the bottom was rotten. He could not but know that this was a material fact, but he replaced her in the water where the purchaser could not have the same opportunity for inspection, and it was upon this state of things that it was held that though he sold " with all faults, " his concealment of the knowledge he

himself had obtained, must be regarded as fraudulent. Here was an act done to prevent the purchaser from getting the knowledge which the seller had and withheld.

Doubtless in a case like this, if the seller of commercial paper knows that the maker has failed or is about to fail and purposely conceals his knowledge from the vendee to whom the same sources of information are not accessible, it would be held to be a fraud. But it must be borne in mind that the fraudulent concealment which will affect a sale of goods or of commercial paper like this in which both parties stand in the main upon an equal footing and " at arms' length " as the phrase is — neither having anything but casual and fortuitous advantages, is not to be tested by the same rules that apply to those standing in exceptional relations to each other, requiring the *strictissima fides*, which is expected as between trustee and *cestui que trust*, counsellor and client, and those sustaining other confidential relations, or those contracting with reference to marine insurance, suretyship and the like. Cases of these descriptions are governed by their own rules which have no application to ordinary business transactions between parties standing on equal footing, to whom the common law says, *caveat emptor*. There was nothing in the case before us that would justify the giving of the requested instruction.

The subject of fraudulent concealment has been much discussed ; and a reference to a few well considered cases (omitting those that for one cause or another fall within exceptional classes) and to the best text writers will suffice to show that the instructions given upon this point were sufficiently favorable to the defendant. *Cross* v. *Peters*, 1 Maine, 376 ; *Hammatt* v. *Emerson*, 27 Maine, 308, 326, 327 ; *Hanson* v. *Edgerly*, 29 N. H. 343 ; *Ward* v. *Hobbs*, Ct. of Appeals, 3 Q. B. Div. 150 ; *Burgess* v. *Chapin*, 5 R. I. 225 ; *Dambmann* v. *Schulting*, 75 N. Y. 55 ; *Peoples Bank* v. *Bogart*, 81 N. Y. 107-109 ; Story's Eq. Jur. § § 207, *et seq.*

*Motion and exceptions overruled.*

APPLETON, C. J., DANFORTH, VIRGIN, PETERS and SYMONDS, JJ., concurred.